Barbara NAHRA, et al., Plaintiffs,

v.

HONEYWELL, INC., Defendant.

No. 1:93 CV 2216.

United States District Court,
N.D. Ohio,
Eastern Division.

May 24, 1995.

Robert E. Blackham, Roetzel & Andress, Akron, OH, Patrick McLaughlin, and Eli Manos, Mansour, Gavin, Gerlack & Manos, Cleveland, OH, for plaintiffs.

Mark A. Gamin, Thompson, Hine & Flory, Cleveland, OH, for defendant.

## ORDER

(Disposing of Docket ## 31 & 36)

SAM H. BELL, District Judge.

Plaintiffs brought this state-law action against Defendant Honeywell, Inc., ("Honeywell") to recover for property damage suffered by Plaintiffs due in part to the alleged failure of Honeywell's alarm service. Both parties have moved for summary judgment, and those motions are the subject of this order. Docket ## 31 & 36.

### STATEMENT OF THE FACTS

Plaintiffs Barbara Nahra and David Nahra, cousins by marriage, formerly owned a warehouse located on East 30th Street in Cleveland, Ohio. Docket # 29, pp. 4–7. From the time they purchased the building in 1976 until November of 1991, Plaintiffs leased the warehouse to Philpott Rubber, a manufacturer of sheet rubber products. *Id.*, pp. 8–9. Philpott moved its operations to Brunswick, Ohio, in November of 1991, leaving the building unoccupied. *Id.*, pp. 9–10, 15.

During its tenancy, Philpott maintained a contract for security alarm services with Honeywell. *Id.*, pp. 13–14. After Philpott vacated the property, the plaintiffs made arrangements to continue the Honeywell service. Daniel Nahra met a Honeywell representative at the building on November 14, 1991 and signed an "Installation and Service Agreement," pursuant to which Plaintiffs agreed to pay a $177 monthly service fee. *Id.*, pp. 12, 14–15; docket # 32, ex. A. Section four of the agreement, titled "Liquidated Damages and Honeywell's Limits of Liability," contains the following pertinent provisions:

It is understood and agreed by the parties hereto that Honeywell is providing a system designed to reduce the risk of loss; that the payments provided herein are based solely on the value of the services as described herein and are unrelated to the value of any property located on Customer's premises; that Honeywell is not liable for losses which may occur in cases of malfunction or nonfunction of the system or of the monitoring, repairing, signaling [sic] handling or dispatching of the service, even if due to Honeywell's negligence or failure of performance; that Honeywell is not an insurer; and that insurance, if any, covering personal injury and/or property loss or damage on customer's premises shall be obtained and or maintained by Customer. Customer understands that Honeywell offers several levels of protection and services and that the system described in the Schedule of Service and Protection has been chosen by Customer after considering and balancing the levels of protection afforded by various systems and the related costs.

IT IS AGREED THAT IT IS IMPRACTICAL AND EXTREMELY DIFFICULT TO FIX ACTUAL DAMAGES WHICH MAY ARISE IN SITUATIONS WHERE THERE MAY BE A FAILURE OF SERVICES PROVIDED, DUE TO THE UNCERTAIN VALUE OF CUSTOMER'S PROPERTY OR THE PROPERTY OF OTHERS KEPT ON THE PROTECTED PREMISES WHICH MAY BE LOST, STOLEN, DESTROYED, DAMAGED OR OTHERWISE AFFECTED BY OCCURRENCES WHICH THE SYSTEM OR SERVICE IS DESIGNED TO DETECT OR AVERT. INABILITY OF CONTRACTOR TO GUARANTEE POLICE AND FIRE DEPARTMENT RESPONSE TIME, AND ESTABLISHING A CASUAL [SIC] CONNECTION BETWEEN THE SYSTEM OR SERVICE PROBLEMS AND CUSTOMER'S POSSIBLE LOSS. THEREFORE IF ANY LIABILITY IS IMPOSED ON HONEYWELL, SUCH LIABILITY SHALL BE LIMITED TO AN AMOUNT EQUAL TO THE ANNUAL SERVICE CHARGE OR $10,000, WHICHEVER IS LESS. (IF THERE IS NO ANNUAL SERVICE CHARGE, HONEYWELL'S LIABILITY

SHALL BE LIMITED TO $500.00.) [SIC] THIS SUM SHALL BE PAID AND RECEIVED EITHER (i) AS LIQUIDATED DAMAGES AND NOT AS A PENALTY, OR (ii) AS A LIMITATION OF LIABILITY APPROVED AND AGREED UPON BY THE PARTIES. THE PAYMENT OF THIS AMOUNT SHALL BE HONEYWELL'S SOLE AND EXCLUSIVE LIABILITY REGARDLESS OF WHETHER LOSS OR DAMAGE IS CAUSED BY THE PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS UNDER THIS CONTRACT OR BY NEGLIGENCE, ACTIVE OR OTHERWISE, OF HONEYWELL, ITS EMPLOYEES, AGENTS OR REPRESENTATIVES. NO SUIT OR ACTION SHALL BE BROUGHT AGAINST HONEYWELL MORE THAN ONE (1) YEAR AFTER THE ACCRUAL OF THE CAUSE OF ACTION THEREFOR.

If Customer wishes Honeywell to increase the amount of the liquidated damages as provided above, Customer may obtain from Honeywell and additional amount of liquidated damages by paying an additional monthly service charge to Honeywell.

Docket # 32, ex. A, sec. 4 (emphasis in the original).

The Honeywell service included a twenty-four hour electronic alarm system that was programmed to send an alarm signal to a Honeywell monitor whenever anyone entered the building. Upon receipt of an alarm signal, Honeywell was to make reasonable efforts to contact law enforcement officials, as well as the owner of the building. Docket # 36, ex. 3, pp. 85–89. Normally, authorized persons wishing to enter the building without activating the alarm signal were required to notify Honeywell in advance. *Id.,* pp. 89–90. Because Philpott regularly had employees coming into the building at the beginning of the workday, the system was programmed not to send an alarm signal for entries made between the hours of 7:30 a.m. and 9:30 a.m. on weekdays. *Id.,* pp. 85–89. This two-hour "open window" remained in effect after Philpott had quit the premises and continued after Plaintiffs had executed their own contract with Honeywell. *Id.*

Honeywell technician Mark Keith investigated a power failure at Plaintiffs' property in early November of 1992. Docket # 36, ex. 4, p. 5. Inside the building, Keith noticed boxes filled with brass fixtures; he also detected damage to the electrical panel. *Id.* Keith asserts that he contacted Honeywell's dispatcher and asked that the plaintiffs be informed of a suspected break-in. *Id.* Virginia Irons, Honeywell's assigned dispatcher on November 12, 1992, has stated in an affidavit that she recalls Keith's report and that she personally contacted Judge Joseph Nahra, Barbara Nahra's husband, to inform him of the suspected entry. Docket # 42, ex. A. Judge Nahra insists that Honeywell contacted neither the police nor him. Docket # 30, p. 23.

On or about Sunday, November 22, 1992, Honeywell received an alarm signal from the plaintiffs' property. A Honeywell employee telephoned Judge Nahra's office and left a message on the answering machine, informing the judge of a suspected break-in. Docket # 30, pp. 28–29; docket # 36, ex. 3, pp. 105–106. Judge Nahra heard the message when he arrived at work on the following Monday; he visited the property and found it stripped of many structural components. Docket # 30, pp. 18, 29. Plaintiffs estimate their loss at $89,938.38. Docket # 1, ex. A, ¶ 6. Plaintiffs filed a claim with their insurer under their vandalism policy; that claim was settled for $27,000.00. Docket # 30, pp. 6–8.

## STATEMENT OF THE CASE

Plaintiffs initiated this suit in the Cuyahoga County Common Pleas Court in September of 1993. Honeywell removed the suit from the state court based on this Court's diversity jurisdiction. Docket # 1. Plaintiffs' complaint contains three counts. Count one alleges breach of contract. Count two asserts a claim for negligence. Count three states a claim for breach of express and implied warranties relative to the burglar alarm system.

In its motion for summary judgment, Honeywell asserts that counts one through three are barred, or, alternatively, limited, by the limitation of liability provisions in the

contract. Additionally, it argues that Plaintiffs' claim sounds solely in contract, not in tort, and therefore count two must be dismissed. In their motion, Plaintiffs ask the Court to grant judgment in their favor on the issue of liability or, at the least, to find the limitation provisions in the contract invalid under Ohio law.

## STANDARD OF REVIEW

The Court of Appeals for the Sixth Circuit has summarized the standard of review governing motions for summary judgment under Federal Rule of Civil Procedure 56 as follows:

> Summary judgment is appropriate where "there is no genuine issue of material fact ... and the moving party is entitled to judgment as a matter of law".... [The] court must view all facts and inferences drawn therefrom in the light most favorable to the non-moving party.
>
> The moving party has the burden of conclusively showing that no genuine issue of material fact exists. Nevertheless, in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim.
>
> "By its very terms, this standard provides that the existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict in favor for the nonmoving party. If the disputed evidence "is merely colorable or is not significantly probative, summary judgment may be granted."

*LaPointe v. United Autoworkers–Local 600,* 8 F.3d 376, 378 (6th Cir.1993) (citations omitted).

■ Summary judgment is the appropriate vehicle for resolving contractual disputes in those instances in which the terms of a written contract are clear and unambiguous. *See, e.g., Cincinnati Gas & Elec. Co. v. West-inghouse Elec. Corp.,* 465 F.2d 1064 (6th Cir.1972).

With these standards in mind, the Court shall analyze the parties' present motions.

## LAW AND ANALYSIS

Honeywell bases its motion for summary judgment on the assertion that the terms of its service contract with Plaintiffs relieve, or, alternatively, limit, Honeywell's liability for the losses suffered by the plaintiffs. The plaintiffs counter that, to the extent it purports to limit or exclude Honeywell's liability, the contract is unconscionable and violates public policy. Bereft of its contractual defense, they argue, Honeywell can raise no genuine issue of material fact such as would preclude a summary judgment award. The Court need not address the enforceability of the limitations provisions unless those provisions would affect Honeywell's liability under the facts presented in this case.

### I. Do the Actual Terms of the Contract Purport to Limit Honeywell's Liability?

Honeywell treats the first two paragraphs of section four of the service agreement as independent limitation provisions, each of which provides a separate defense to Plaintiffs' damage claims. According to Honeywell, the first paragraph exculpates Honeywell from all liability, whereas the second serves as a sort of reserve clause, limiting Honeywell's liability to a fixed sum in the event the preceding exculpatory clause is not enforced.

■ Contrary to Honeywell's assertion, the first paragraph of section four, standing alone, does not appear to protect Honeywell from all damage claims. The paragraph states in part that "Honeywell is not liable for losses which may occur in cases of malfunction or nonfunction of the system or of the monitoring, repairing, signaling [sic] handling or dispatching of the service, even if due to Honeywell's negligence or failure of performance." This disclaimer addresses two definable but limited sources of liability: mechanical failure ("malfunction or nonfunction") and certain human errors (negligent

monitoring, etc.). Arguably, the circumstance to which Plaintiffs attribute their loss—Honeywell's dereliction in leaving the system down during the morning hours—stems from neither source. It does not concern a mechanical failure within the system[1] —Plaintiffs do not assert that the alarm system functioned improperly. Rather, the alleged breach of contract involved a form of human error (failure to reprogram the system) separate and apart from any lapse in "monitoring, repairing, signaling, handling or discharging." The first paragraph of section four alone does not unequivocally exculpate Honeywell for losses flowing from this type of error and therefore cannot carry Defendant's motion.

■ Assuming *arguendo* that the exculpatory language in the initial paragraph of section four is broad enough to encompass Honeywell's alleged breach, the paragraph—positioned as it is—still fails to shield Honeywell from all liability. As noted, Honeywell reads the first and second paragraphs of this section disjunctively: the former exculpating Honeywell completely, the latter placing a fixed capped on Honeywell's liability solely in the event the provisions of the first paragraph are ignored or found wanting by a court. Yet all reasonable attempts to understand the section as part of an integrated agreement counsel against such a reading. The entire section falls under the single heading "Liquidated Damages and Honeywell's Limits of Liability," and the second paragraph, which describes the limits of Honeywell's liability, is the sole paragraph printed entirely in capital letters. Moreover, the third paragraph speaks of Plaintiffs' unconditional right to increase the liability limit discussed in the second paragraph for an additional charge. Given the predominant, structural focus on *limited* damages running throughout the section and the absence of any explicit direction that two alternative and exclusive limitation provisions are contemplated, section four can be understood only

as a single limitation provision. Construed in this context, the first paragraph of section four serves a prefatory purpose, stressing the need for the limitations clause and Plaintiffs' independent obligation to secure property insurance. Dealing with a similar provision, the state court in *Royal Indemnity Co. v. Baker Protective Services, Inc.*, 33 Ohio App.3d 184, 186, 515 N.E.2d 5 (Montgomery County 1986), appears to have reached the same conclusion: "While the terms of paragraph "D" are somewhat contradictory [including exclusionary as well as simple limiting terms], we believe that the language used placed the liability for a burglary loss *in excess of $250* [the agreed limit] with [the purchaser], which hedged or spread part of the risk of loss by the purchase of burglary insurance" (emphasis added).

■ Having said that a single paragraph of section four may not logically be extracted to demonstrate an intent to exculpate Honeywell completely[2], the Court must also conclude that the section taken as a whole (assuming it is enforceable) clearly fixes Honeywell's liability at the lesser of $10,000 or the annual service fee. Whereas the exculpatory language in the first paragraph refers to a limited category of potentially protected events, the terms of the second paragraph broadly and explicitly limit Honeywell's liability for Plaintiffs' losses, whatever their source:

> It is agreed that it is impractical and extremely difficult to fix actual damages which may arise in situations where there may be a failure of *services* provided.... Therefore *if any liability is imposed on Honeywell,* such liability shall be limited to an amount equal to the annual service charge or $10,000, whichever is less.... *The payment of this amount shall be Honeywell's sole and exclusive liability* regardless of whether loss or damage is caused by the performance or nonperformance of obligations under this contract or

---

1. As used in the contract, the Court understands the term "system" to refer to the actual detection and signaling device with its various mechanical and electronic components. The word "service," on the other hand, includes the entire protection package offered by Honeywell, including not

only the electronic system but also its implementation, maintenance and ongoing monitoring.

2. The Court in no way means to suggest that Honeywell could not exculpate itself from all liability in an appropriately drafted contract.

by negligence, active or otherwise, of Honeywell, its employees, agents or representatives.

Def.'s Ex. A, sec. 4 (emphasis added). Significantly, the language in this section contemplates not simply a mechanical failure of the alarm *system* but rather any failure in the provision of the *services* offered by Honeywell. The contract expressly provides that Honeywell's liability for losses suffered by the plaintiffs shall be limited whether those losses derive from Honeywell's performance *or* nonperformance of its contractual obligations. Failure to activate the alarm system constitutes either negligent performance or a failure to perform on Honeywell's part. Thus, on its face, the section limits Honeywell's liability to Plaintiffs.

## II. *May the Terms of the Contract be Enforced against Plaintiffs?*

Plaintiffs maintain that, regardless of the protection it purports to offer Honeywell, section four of the agreement is unconscionable and is in violation of public policy and therefore cannot be enforced. To support this argument, Plaintiffs rely almost exclusively on a 1984 decision by the Ohio Supreme Court, *Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St.3d 27, 465 N.E.2d 392 (1984).

### A. *Samson* and Liquidated Damages.

*Samson* involved a dispute concerning Honeywell's liability for damages arising from the failure of a Honeywell security system. The plaintiff, owner of a pawn shop, had purchased a security system for the shop from Morse Signal Devices. *Id.* at 27, 465 N.E.2d 392. The plaintiff paid Morse $1,500.00 to install the system and paid an additional $150.00 service charge. *Id.* The contract between the parties contained the following provision, deemed by the parties and treated by the courts solely as a liquidated damages clause:

It is agreed by and between the Parties that Company is not an insurer; and that this Agreement in no way binds Company as an insurer of the premises or of the property of the Subscriber, and that all charges are based solely on the value of the service, maintenance and installation of the system. In the event of loss or damage to Subscriber resulting by reason of failure of the performance of such service or the failure of the system to properly operate, Company's liability, if any, shall be limited to the sum of Fifty dollars ($50.00) as liquidated damages and not as a penalty and this liability shall be exclusive.

*Id.* at 28, 465 N.E.2d 392.

Prior to the expiration of the contract, Honeywell purchased Morse. *Id.* at 27, 465 N.E.2d 392. A burglary at the pawn shop cost the plaintiff over $68,000.00 in damages, and the plaintiff claimed that the loss was incurred due to Honeywell's negligent failure to transmit an alarm signal to the police as promised under the contract. Relying on the liquidated damages clause, Honeywell refused to pay the plaintiff more than $50.00 in damages. *Id.*

The plaintiff sued Honeywell for breach of contract. The Court of Common Pleas of Cuyahoga County granted summary judgment for the plaintiff in the amount of $50.00. The judgment was overturned by the court of appeals, which held that the $50.00 liquidated damages provision actually constituted an unenforceable penalty. *Id.* at 28, 465 N.E.2d 392.

The Ohio Supreme Court affirmed. *Id.* at 29, 465 N.E.2d 392. For its holding, the court reiterated *verbatim* the second paragraph of the syllabus in *Jones v. Stevens,* 112 Ohio St. 43, 146 N.E. 894 (1925):

Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.

*Samson,* 12 Ohio St.3d 27, 465 N.E.2d 392 (paragraph one of the syllabus).

The *Samson* court applied each of the three criteria identified in *Jones* to the facts before it. *Id.* Concerning the first, the court observed that the damages suffered by the plaintiff were readily susceptible to proof. As to the second, the court found the fixed sum of $50.00 "manifestly disproportionate" to the plaintiff's foreseeable damages. Finally, the court concluded summarily that it was "beyond comprehension that the parties intended that damages in the amount of $50.00 should follow the negligent breach of the contract." *Id.* Finding none of the *Jones* criteria satisfied, the justices agreed that there had been no "conscious intention of the parties to consider, estimate, or adjust the damages that might reasonably flow from the negligent breach of the agreement." *Id.* This being true, the liquidated damages provision could not be enforced.

■ Since the decision in *Samson* was announced, numerous Ohio courts have been asked to enforce liquidated damages clauses and/or limitation of liability clauses in alarm systems contracts. *See, e.g., Ferguson v. Honeywell,* No. C–930380, 1994 WL 388695 (Hamilton County Ct.App. July 27, 1994) (liquidated damages clause upheld); *Royal Indemnity,* 33 Ohio App.3d 184, 515 N.E.2d 5 (limitation of liability clause upheld); *Zurich–American Ins. Co. v. Citadel Alarm, Inc.,* No. 50499, 1986 WL 5291 (Cuyahoga County Ct.App. May 8, 1986) (liquidated damages clause void as a penalty). While the decisions do not easily reconcile, each purports to draw guidance from *Samson.* As an unfortunate result, at least some courts (*see, e.g., Royal Indemnity,* 33 Ohio App.3d at 186, 515 N.E.2d 5), as well as the present parties, have blurred the distinction between the law governing the enforceability of *liquidated damages* clauses and the law applicable to related, but distinct, *limitation of liability* clauses. While both types of clauses may under certain circumstances be found to be unconscionable or to violate public policy, the factual predicates for these findings, like the legal rationales allowing such clauses in the first instance, differ with the type of clause involved. *Restatement (First) of Contracts* § 339 cmt. g (1932).[3] Liquidated damages clauses, properly employed, attempt to fix in advance "reasonable compensation for actual damages." However, limitation of liability clauses by definition restrict the amount of compensation available, regardless of the actual damages ultimately suffered. *Cf. The Morgan Co. v. Minnesota Mining & Mfg. Co.,* 310 Minn. 305, 246 N.W.2d 443, 447–448 (1976); *Vallance & Co. v. Anda,* 595 S.W.2d 587, 590 (Tex.Civ.App.1980). Thus, failure to "consider, estimate or adjust the damages that might reasonably flow from the negligent breach of the agreement" undermines the integrity of a liquidated damages provision but is not inimitable to the permissible use of limitation clauses.

## B. Limitation of Liability.

■ While viewed critically by the courts, limitation of liability clauses (including exculpatory clauses) may be freely bargained for in Ohio. *Berjian v. Ohio Bell Telephone Co.,* 54 Ohio St.2d 147, 375 N.E.2d 410 (1978); *The George H. Dingledy Lumber Co. v. Erie Railroad Co.,* 102 Ohio St. 236, 131 N.E. 723 (1921); *Schwenck v. Spitzer Marina,* No. 65660, 1994 WL 385972 (Cuyahoga County July 21, 1994); *Collins v. Click Camera & Video, Inc.,* 86 Ohio App.3d 826, 621 N.E.2d 1294 (Montgomery County 1993); *Royal Indemnity Co. v. Baker Protective Services, Inc.,* 33 Ohio App.3d 184, 515 N.E.2d 5 (Montgomery County 1986). And "[a]bsent important public policy concerns, unconscionability, or vague and ambiguous terms, [such] provisions will be upheld," *Collins,* 86 Ohio App.3d at 832, 621 N.E.2d 1294, so long as the party invoking the provision has not committed a willful or reckless

---

**3.** Comment g states: "An agreement limiting the amount of damages recoverable for breach is not an agreement to pay either liquidated damages or a penalty. Except in the case of certain public service contracts, the contracting parties can by agreement limit their liability in damages to a specified amount, either at the time of making their principal contract, or subsequently thereto. Such a contract does not purport to make an estimate of the harm caused by a breach; nor is its purpose to operate *in terrorem* to induce performance."

breach. *Berjian*, 54 Ohio St.2d at 158, 375 N.E.2d 410.

In *Berjian*, the Ohio Supreme Court upheld an exculpatory clause that permitted the regional Bell Telephone company to disclaim liability for its failure to print as agreed an advertisement in the classified section of the telephone directory. Because state law did not require the company to provide advertising services, the court found that the company was not fulfilling a public function in selling advertising space in the yellow pages; therefore, the general proscription against the use of limitation of liability clauses by public utilities did not apply. *Berjian*, 54 Ohio St.2d at 156, 375 N.E.2d 410. Moreover, the court rejected the claim that the telephone company held a monopoly over the advertising service provided, noting "the classified directory is not the sole means of advertising available to customers of the telephone company." *Id.* The justices acknowledged the fact that the standardized forms used by the telephone company to sell advertising space prevented the purchaser from dickering over the exculpatory clause. But given the benefits derived from such forms, to wit, lower costs, the court concluded that their use did not conflict with the public interest. *Id.* In summation, the court announced: "It would serve no clear public purpose to in effect make telephone companies insurers for the consequential damages sustained by their customers by holding that the companies cannot limit their liability to the cost of services provided in situations where they negligently omit or improperly list a customer's order in the classified directory." *Id.* at 157, 375 N.E.2d 410.

Drawing largely from the *Berjian* opinion, the appellate court in *Collins* listed a series of factors properly considered in determining whether a given limitation clause affronts the public interest: "whether the goods or services contracted for are necessary for a person's living needs; whether the supplier assumes a quasi-public function in providing the goods; whether the supplier has been granted a monopoly in providing a specific service; and whether the limitation provision is such that the customer is in a position to assent to its terms." *Collins*, 86 Ohio App.3d

at 832, 621 N.E.2d 1294; *Young v. Glaze*, 66 Ohio Misc.2d 74, 643 N.E.2d 186 (Wadsworth County Mun.Ct.1994).

The doctrine of unconscionability, like the public policy exception to limitation clauses, protects vulnerable parties from undue coercion. A party seeking to avoid a limitations clause on grounds of unconscionability must show that the clause is commercially unreasonable *and* that he had no meaningful choice but to accept its inclusion in the contract. *Collins*, 86 Ohio App.3d at 834, 621 N.E.2d 1294; *Orlett v. Suburban Propane*, 54 Ohio App.3d 127, 561 N.E.2d 1066 (Warren County 1989). Factors helpful in measuring the reasonableness of the clause include: "the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future injury." *Collins*, 86 Ohio App.3d at 834, 621 N.E.2d 1294. In weighing the second prong of unconscionability, that is, lack of choice, courts have examined different considerations bearing on the parties' respective bargaining positions, such as " 'age, education, intelligence, business acumen and experience, ... who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question.' " *Id., quoting Johnson v. Mobil Oil Corp.*, 415 F.Supp. 264, 268 (E.D.Mich.1976).

In Ohio and elsewhere, alarm system suppliers make frequent use of limitation provisions in their service contracts. As noted by the United States Court of Appeals for the First Circuit: "Courts ... have repeatedly upheld limitation of liability clauses in burglar alarm service contract cases against allegations that they are violative of public policy." *E.H. Ashley & Co. v. Wells Fargo Alarm Services*, 907 F.2d 1274, 1278 (1st Cir.1990) (citations omitted); *accord Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44 (2nd Cir.1993). Such clauses have been enforced in Ohio, *see, e.g., Royal Indemnity*, 33 Ohio App.3d 184, 515 N.E.2d 5. Quoting a California appellate court, the Second Circuit panel in *Leon's Bakery* summarized the ar-

gument typically raised in defense of limitation provisions in alarm system contracts:

> [M]ost persons, especially operators of business establishments, carry insurance for loss due to various types of crime. Presumptively insurance companies who issue such policies base their premiums on their assessment of the value of the property and the vulnerability of the premises. No reasonable person could expect that the provider of an alarm service would, for a fee unrelated to the value of the property, undertake to provide an identical type of coverage should the alarm fail to prevent a crime.

990 F.2d at 48–49, *quoting Guthrie v. American Protection Industries,* 160 Cal.App.3d 951, 954, 206 Cal.Rptr. 834, 836 (1984).

### C. Is Section Four of the Contract a Limitation or a Liquidated Damages Clause?

■ The contract provisions at issue, like the parties' briefs, treat limitation clauses and liquidated damages clauses indiscriminately. In what seems to be an excess of caution, the drafters provide: "This sum shall be paid and received either (i) as liquidated damages and not as a penalty, or (ii) as a limitation of liability approved and agreed upon by the parties." Docket # 2, ex. A, sec. 4. Although the section suffers the "old 'belt and suspenders' malady" noted by the court in *Royal Indemnity,* 33 Ohio App.3d at 186, 515 N.E.2d 5, read in its entirety it reflects a primary intention to limit Honeywell's liability without regard to the actual amount of damages to be suffered: "Therefore if any liability is imposed on Honeywell, *such liability shall be limited to an amount equal to the annual service charge or $10,000, whichever is less."* Docket # 32, ex. A, sec. 4.

> "The fact that the words 'liquidated damages' were used in the contract has little bearing on the nature of the provision. It is well settled that in determining whether a particular clause calls for a liquidated damages or for a penalty, the name given to the clause by the parties 'is but of slight weight, and the controlling elements are the intention of the parties and the special circumstances of the case.' [Citations omitted in the original]. The same princi-

ple applies here. Nor can it be argued that the use of these words automatically creates an ambiguity to be resolved against the ... drafter of the instrument."

*Morgan,* 246 N.W.2d at 448, *quoting Wedner v. Fidelity Security Systems, Inc.,* 228 Pa.Super. 67, 307 A.2d 429, 431 (1973); *cf. Rinaldi & Sons, Inc. v. Wells Fargo Alarm Service, Inc.,* 39 N.Y.2d 191, 383 N.Y.S.2d 256, 258, 347 N.E.2d 618, 620 (1976). In this particular instance, the variable nature of the award and Honeywell's agreement to increase the award for an additional monthly charge belie any suggestion that the agreed sum represents the parties' attempt either to approximate Plaintiffs' actual damages or to affix a penalty to discourage Defendant's non-performance. Rather, taken as a whole, section four of the agreement must be reasonably construed as a limitation of liability.

### D. Is the Limitation Clause Unconscionable or Contrary to Public Policy?

Having explored the law concerning limitation provisions, we return at last to the question at the heart of the pending motions. Does either the doctrine of unconscionability or public policy preclude enforcement of the contractual limitation on Honeywell's liability? Plaintiffs draw their arguments against enforcement from *Samson.* As observed previously, the court in *Samson* confined its discussion and holding to the enforceability of liquidated damages provisions. The limitation of damages provisions presently at issue must be distinguished. Shorn of the liquidated damages analysis, *Samson* loses its strength as controlling precedent. *Dingledy, Berjian* and their progeny emerge as the guiding authorities.

■ Based on the facts before it, and applying the principles identified in section II.B, *supra,* the Court holds that the limitation provision in section four of the parties' agreement does not violate public policy. Honeywell does not hold the bargaining leverage enjoyed by public utilities and monopolies. And while Honeywell acknowledges the common use of limitation provisions throughout the industry, docket # 31, p. 6, this admission standing alone in no way

demonstrates Plaintiffs' inability to obtain an alarm system from a Honeywell competitor on more favorable terms. Moreover, the contract itself recognizes Plaintiffs' option to increase Honeywell's liability under the contract for an additional charge. Docket #32, ex. A, sec. 4. Finally, it is important to note that the service provided, while valuable, cannot fairly be described as a basic necessity. Its value to Plaintiffs was plainly commercial and not personal in nature. *Cf. Collins*, 86 Ohio App.3d at 833, 621 N.E.2d 1294. Had Plaintiffs been dissatisfied with the market options available to them, they could have arranged for other forms of security or, alternatively, elected to forego security completely.

■ For similar reasons, the Court finds the limitation provision not to be unconscionable. Plaintiffs could have sought a security system elsewhere, or they could have asked to increase Honeywell's liability under the contract. Docket #32, ex. A, sec. 4. Plaintiff David Nahra's [4] professional background, docket #29, pp. 3–5, reveals his considerable "business acumen and experience." *Collins*, 86 Ohio App.3d at 834, 621 N.E.2d 1294. Given these factors, Plaintiffs cannot complain that they had no reasonable alternative but to accept the contract terms offered by Honeywell. Nor is the Court convinced that those terms are commercially unreasonable. Honeywell received $2,124.00 annually from Plaintiffs; rather than accept therewith unknown liability for future damages (in this case totaling nearly $90,000.00) suffered due to the failure of its services, Honeywell contracted instead to refund the annual service charge in cases of loss. As pointed out by the *Leon's Bakery* court, "The owner or custodian of the property is in a far better position than the alarm system seller to know the property's value and to bargain with an insurance company for appropriate coverage and an appropriate premium ..."

990 F.2d at 49. In this particular case, Plaintiffs themselves seem to have grossly underestimated the risk of loss due to theft. *See* docket #36, p. 1; docket #29, p. 21–22 (Plaintiffs elected not to carry insurance against theft because the building was empty). Under these circumstances, it was commercially reasonable for Honeywell to seek as a basis of the bargain a fixed limit on its potential liability.

It can be argued that this Court's view here imprudently encourages players in the alarm service industry to ignore all reasonable standards of care. Faced with the same argument in a similar case, the dean of the law and economics movement has offered a logical response: "Our society relies more heavily on competition than on liability to optimize the quality of the goods and services supplied by the private sector of the economy. A case such as this does Honeywell's customer relations no good even if it [Honeywell] wins the case...." *Edwards v. Honeywell*, 50 F.3d 484, 491 (7th Cir.1995) (Posner, C.J.). Should Plaintiffs prevail on their contract claim, Honeywell will (in addition to suffering bad publicity) be forced to return the annual service charges paid by the plaintiffs and thus, most likely, will sustain a loss on the contract. If Judge Posner and standard market theory may be believed, Honeywell's interest in its own survival will provide at least one deterrent against a repeat performance.

### III. *May Plaintiffs Maintain a Separate Claim for Negligence?*

■ Under Ohio law, "a tort exists only if a party breaches a duty which he owes to another independently of the contract, that is, a duty which would exist even if no contract existed." *Wolfe v. Continental Casualty Co.*, 647 F.2d 705, 710 (6th Cir.1981). Relying on the *Restatement (Second) of Torts* § 323 [5], Plaintiffs argue that Honeywell

---

4. Plaintiffs intimate in their brief that Mr. Nahra never actually read the contract before signing it: "Although a man of some intelligence, it is doubtful that he took the time to read the Service Agreement or that he comprehended it." Docket #36, p. 9. If indeed Plaintiffs seek to show that Mr. Nahra did not read the agreement, some form of evidence aside from counsel's specula-

tion is necessary to raise a factual issue. More important, Nahra's failure to read the contract he signed cannot be raised to show the absence of a true agreement. *Cuyahoga County Hospitals v. Price*, 64 Ohio App.3d 410, 415, 581 N.E.2d 1125 (Cuyahoga County 1989).

5. Section 323 provides in part: "One who undertakes, gratuitously or for consideration, to render

owed them a duty, independent from the contract, to exercise reasonable care in providing security services. Plaintiffs offer no authority to demonstrate that Ohio has adopted this "liberal formulation" of the Good Samaritan Doctrine, *Myers v. United States,* 17 F.3d 890, 902 (6th Cir.1994), or that application of the doctrine to the facts in this case would subject Honeywell to tort liability. The Court agrees with Defendant that it would not. *Cf. Steiner Corp. v. American District Telegraph,* 106 Idaho 787, 683 P.2d 435 (1984). Assuming *arguendo* that the law *did* impose an independent duty on Honeywell to monitor actively the alarm system, Honeywell expressly limited its liability for the negligent breach of that duty in section four of the contract: "The payment of this amount shall be Honeywell's sole and exclusive liability regardless of whether loss or damage is caused by the performance or nonperformance of obligations under this contract *or by negligence, active or otherwise, of Honeywell, its employees, agents or representatives.*" Docket # 32, ex. A, sec. 4 (emphasis added). *See Orlett v. Suburban Propane,* 54 Ohio App.3d 127, 561 N.E.2d 1066 (Warren County 1989) (contractual provision excusing party from his own negligence generally enforced); *see also Leon's Bakery,* 990 F.2d at 49 (upholding limitation of liability clause against negligence claim); *Robin Towing Corp. v. Honeywell, Inc.,* 859 F.2d 1218, 1221 (5th Cir.1988) (recognizing enforceability in Louisiana of no-liability clauses against claims based on negligence).

## IV. *Do Factual Disputes Remain Concerning Honeywell's Liability?*

 Although the Court has determined that Honeywell's liability under the contract is limited, Plaintiffs' motion for summary judgment requires the Court to consider whether Honeywell may be found liable for breach as a matter of law. The conflicting evidence regarding whether or not Judge Nahra received notice of the potential break-in from Honeywell on November 12, 1992

services to another ... necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to

precludes the Court from entering judgment on the question of liability at this time.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment, docket # 36, is denied. Defendant's motion for summary judgment, docket # 31, is granted in part and denied in part. This matter will precede to trial to determine the question of liability. Should Honeywell be found liable to Plaintiffs, any damage award must be limited under the contract to $2,124.00.

IT IS SO ORDERED.

perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm."