**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1802-17T4

NATIONAL FIRE INSURANCE
COMPANY OF HARTFORD,
a/s/o REFORMED CHURCH
MINISTRIES TO THE AGING,

      Plaintiff-Appellant,

v.

CINTAS FIRE PROTECTION,
INC.,

      Defendant-Respondent.

_____

Argued April 29, 2019 – Decided May 21, 2019

Before Judges Sabatino, Mitterhoff and Susswein.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-6413-16.

W. Dana Venneman argued the cause for appellant (Law Office of Steven J. Tegrar, attorneys; William E. Paulus, on the briefs).

Dennis M. Marconi argued the cause for respondent (Barnaba & Marconi, LLP, attorneys; Dennis M. Marconi, on the brief).

PER CURIAM

Plaintiff National Fire Insurance Company of Hartford ("National Fire"), appeals the trial court's order of summary judgment dismissing its subrogation claim against defendant Cintas Fire Protection, Inc. ("Cintas"). Cintas installed fire sprinklers in a nursing facility operated by National Fire's insured, Reformed Church Ministry to the Aging ("RCMA"). After the sprinklers were installed, a pipe burst and caused roughly $1.5 million in property damages to nursing facility. RCMA submitted a claim to National Fire, which paid the claim in full. National Fire then obtained an assignment of RCMA's rights and brought this subrogation again against Cintas to recoup the indemnity payments.

The trial court granted summary judgment to Cintas based on a waiver-of-subrogation clause in the contract for services between RCMA and Cintas. In so holding, the trial court determined that pursuant to the contract terms, Ohio law governed the dispute. The trial court also found that a limitation-of-liability provision in the contract, which limited recovery against Cintas to $1,000, was enforceable. We affirm, substantially for the reasons set forth in Judge Lisa M. Vignuolo's oral opinion, adding only the following comments.[1]

_____

[1] Although the judge's oral ruling was clear, the accompanying order is ambiguous as to the court's ruling on the limitation-of-liability clause. The

RCMA operates a nursing facility in Old Bridge, New Jersey. On October 22, 2012, RCMA entered into a "Fire Protection Proposal" (the "contract") with Cintas for the installation of thirty-three dry sidewall sprinkler heads in all of the balconies in the nursing facility for $28,760. Russel Nagy, the "GM [of] Facilities," executed the contract on behalf of RCMA.

On the front side of the one-page written agreement, a section entitled "Acceptance of Proposal" provides:

> The specification and payment terms of this proposal are satisfactory and hereby accepted. Signing and accepting this proposal constitutes acknowledgement for the receipt and acceptance of the Cintas Corporation Terms and Conditions of Sale – Fire Equipment and Services, included in this proposal. I am authorized to approve this proposal and its payment as an agent of the "Customer" whose information is contained in this proposal. You are authorized to begin work as provided.

---

judge stamped "DENIED" over the portion of Cintas' proposed order awarding National Fire $1,000 under the terms of the contract. Stemming from this ambiguity, Cintas filed a cross-appeal as to this issue, but withdrew the cross appeal once it had received the transcript of Judge Vignuolo's oral decision. Similarly, National Fire states in its brief that the trial court "den[ied] the part of the motion that sought to limit RCMA'S damages to $1,000 under the liquidated damages clause."

In her oral opinion, Judge Vignuolo clearly ruled that the limitation-of-liability clause was enforceable. This oral ruling is controlling. See Taylor v. Int'l Maytex Tank Terminal Corp., 355 N.J. Super. 482, 498 (App. Div. 2002) ("Where there is a conflict between a judge's written or oral opinion and a subsequent written order, the former controls.").

A-1802-17T4

The signature line is below these statements. Below the signature line, the contract provides, "The acceptance of this proposal is subject to the Terms and Conditions Attached."

Accordingly, the back of the contract provides,[2] in small print, the terms and conditions of sale. Three particular provisions contained in these terms and conditions are at issue in the instant appeal.

First, the contract contained a choice-of-law clause, providing in pertinent part: "**14. Governing Law; Disputes.** The rights and obligations of the parties contained herein shall be governed by the laws of the State of Ohio, excluding any choice of law which may direct the application of the laws of another jurisdiction." (Emphasis in original).

Second, the contract required RCMA to maintain an insurance policy on the property and to indemnify Cintas for all losses arising from claims required to be covered by the insurance policy:

> **9. Cintas not an insurer. Indemnification of Cintas by Purchaser.** Purchaser agrees that neither Cintas nor its subcontractors or assignees, including, without limitation, those providing monitoring services,

---

[2] The trial court noted, quite accurately, that the clauses were "in small type on the back of the contract itself." In its brief, Cintas states that the terms and conditions were "on the next page of the [c]ontract."

(collectively, "Subcontractors") are insurers and no insurance coverage is provided by this Agreement.

PURCHASER ACKNOWLEDGES AND AGREES THAT CINTAS AND ITS SUBCONTRACTORS DO NOT ASSUME RESPONSIBILITY NOR SHALL THEY HAVE ANY LIABILITY FOR CLAIMS MADE AGAINST THEM CLAIMING THAT THEY ARE AN INSURER OF PURCHASER'S SYSTEMS, THE FAILURE OF SUCH SYSTEMS TO OPERATE EFFECTIVELY, OR ANY OTHER TYPE OF INSURANCE COVERAGE AS AN INSURER. Purchaser acknowledges that during the term of the Agreement, it will maintain a policy of insurance, covering public liability, bodily injury, sickness or death, and losses for property damage, fire, water damages, and loss of property in amounts that are sufficient to cover all claims of Purchaser for any losses sustained.

PURCHASER AGREES TO INDEMNIFY AND HOLD CINTAS AND ITS SUBCONTRACTORS HARMLESS FROM AND AGAINST ALL COSTS, EXPENSES (INCLUDING ATTORNEYS' REASONABLE FEES) AND LIABILITY ARISING FROM CLAIMS REQUIRED TO BE COVERED BY INSURANCE PURSUANT TO THIS SECTION, INCLUDING ANY CLAIMS FOR DAMAGES ATTRIBUTABLE TO BODILY INJURY, SICKNESS OR DEATH OR THE DESTRUCTION OF ANY REAL OR PERSONAL PROPERTY. Cintas shall not be responsible for any claims of Purchaser against the Subcontractors nor for any portion of any loss or damage that is required to be insured, is insured or insurable and shall be indemnified by Purchaser against all such claims including the claims of any third parties.

[(Emphasis and capitalization in original).]

A-1802-17T4

Third, the contract contained a limitation-of-liability clause:

**10. LIMITATION OF LIABILITY OF CINTAS, LIQUIDATED DAMAGES.** THE LIABILITY OF CINTAS AND ITS SUBCONTRACTORS FOR ANY CLAIMS WHICH PURCHASER, ITS AGENTS, OFFICERS, DIRECTORS, EMPLOYEES OR INVITEES MAY HAVE AGAINST CINTAS PURSUANT TO THIS AGREEMENT, IN THE EVENT IT IS DETERMINED THAT CINTAS HAS ANY LIABILITY, SHALL BE LIMITED TO $1,000 AS LIQUIDATED DAMAGES. If Purchaser wishes to increase the limitation of liability, Purchaser may, as of right, enter into a supplemental agreement with Cintas, and obtain a higher limit by paying an additional amount consistent with the increase in liability.

Seller's service fees are based on the value of the services provided and the limited liability provided under this contract, and not on the value of Purchaser's premises or contents, or the likelihood of potential extent or severity of the injury (Including death) to Purchaser or others. Seller cannot predict the potential amount, extent, or severity of any damages or injuries that Purchaser or others may incur which could be due to the failure of the system or services to work as intended. As such (I) Purchaser hereby agrees that the limits on the liability of Cintas and Subcontractors, and the waivers and indemnities set forth in this contract are a fair allocation of risks and liabilities between Cintas, Purchaser, Subcontractors and any other affected third parties; (II) except as provided in this agreement, Purchaser waives all rights and remedies against Cintas and Subcontractors including rights of subrogation that Purchaser, any insurer, or third party may have due to any losses or injuries subscriber or others incur.

6

> Purchaser agrees that were Cintas and its Subcontractors to have liability greater than that stated above, it would not provide the services. Neither party shall be liable to the other or any other person for any incidental, punitive, loss of business profits, speculative or consequential damages.
>
> [(Emphasis and capitalization in original).]

As alleged in National Fire's complaint, on October 19, 2013, a leakage occurred in the "A" wing balcony of the nursing facility from the sprinkler system that had been recently installed by Cintas pursuant to the contract. Thomas Hart, the Old Bridge Fire Marshall, responded to the facility on October 19 and determined "that the orange fire sprinkler pipe which was being installed for balcony sprinkler heads . . . was separated at the elbow[,] and it was obvious that the connection was not glued together which resulted in the separation and caused the water to flow." Similarly, an engineering consultant retained by RCMA opined that the socket joint failure caused the leakage of water and resulting damage, and that "[t]he socket joint failure was caused either by: improper socket joint assembly, improper curing of construed socket joint, or a combination thereof."

RCMA suffered property damage and losses in excess of $1.5 million, and National Fire made indemnity payments to RCMA in accordance with the insurance policy in an amount in excess of $1.5 million. Accordingly, in the

underlying subrogation action, National Fire sought to recover damages in excess of $1.5 million.

On November 6, 2017, the trial court, applying Ohio law, rendered an oral decision granting Cintas' motion for summary judgment based on the contract's waiver-of-subrogation clause. In that regard, the judge noted that the contract was not a consumer contract and was entered into between two business entities. The judge rejected National Fire's contentions that the contract was unconscionable, reasoning that: (1) Cintas did not have a duty to explain the waiver-of-subrogation clause to RCMA; (2) there was no factual evidence in the record indicating that RCMA was unable to understand the terms of the contract; (3) Ohio law permits contractual terms to be on the back of a document; and (4) there was no factual evidence in the record indicating that RCMA attempted to negotiate different or additional terms. In sum, the judge found that RCMA waived its right to subrogate its claim by the express language of the contract, and that such a waiver was enforceable under Ohio law.

Although noting that the ruling on the waiver of subrogation "resolve[d] all outstanding issues relative to the enforcement of the contract with respect to National Fire attempting to asserts rights as a subrogee," the trial judge also determined that the limitation-of-liability clause was enforceable under Ohio

law.  The judge reasoned that under Ohio law, such a clause is enforceable unless it is "commercially unreasonable."  The judge found no factual evidence in the record supporting that the limitation-of-liability clause was commercially unreasonable.

This appeal ensued.  On appeal, National Fire contends that the trial court erred in determining that Ohio law applies.  National Fire also argues that the waiver-of-subrogation and limitation-of-liability clauses in the contract are unconscionable and unenforceable.  Finally, National Fire contends that the trial court erred in granting summary judgment prior to the close of discovery.

We review a grant of summary judgment de novo, applying the same standard as the trial court.  Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010).  Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."  R. 4:46-2(c).  The court considers whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in

A-1802-17T4

favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"The trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). "The analytical framework for deciding how to resolve a choice-of-law issue is a matter of law." McCarrell v. Hoffmann-La Roche, Inc., 227 N.J. 569, 583 (2017). Accordingly, we review the trial court's choice-of-law determination de novo. Id. at 583-84.

Choice of law

We first address National Fire's contention that the trial court erred in its determination that Ohio law governs the dispute. Citing to Ginsberg v. Quest Diagnostic, Inc., 441 N.J. Super. 198 (App. Div. 2015), National Fire argues that Ohio has no substantial relationship to the transaction, and that New Jersey has a more substantial relationship to the transaction. National Fire's citation to Ginsberg, however, is inapposite, as that case addressed the choice-of-law standards governing tort cases. Id. at 209-11.

The New Jersey Supreme Court set forth the standards for evaluating contractual choice-of-law provisions in Instructional Sys., Inc. v. Computer

Curriculum Corp., 130 N.J. 324, 341-42 (1992).  In Instructional Sys., the Court

held that "[o]rdinarily, when parties to a contract have agreed to be governed by

the laws of a particular state, New Jersey courts will uphold the contractual

choice if it does not violate New Jersey's public policy."  Id. at 341.  In so

holding, the Court endorsed the standards set forth in the Restatement (Second)

of Conflict of Laws ("Restatement"), which provides that the law of the state

chosen by the parties in the contract will apply, unless either:

> (a) the chosen state has no substantial relationship to
> the parties or the transaction and there is no other
> reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be
> contrary to a fundamental policy of a state which has a
> materially greater interest than the chosen state in the
> determination of the particular issue and which * * *
> would be the state of the applicable law in the absence
> of an effective choice of law by the parties.
>
> [Id. at 342 (quoting Restatement (Second) of Conflicts
> of Laws, § 187 (Am. Law Inst. 1969).]

In this case, National Fire is not entitled to relief under either exception.

With respect to the exception in subsection (a), Ohio has a substantial

relationship to the transaction because Cintas is headquartered in Ohio.  See N.

Bergen Rex Transp., Inc. v. Trailer Leasing Co., a Div. of Keller Sys., 158 N.J.

561, 569 (1999) ("The substantial relationship standard under the Restatement

has been met in the present case because TLC is headquartered in Illinois.").

With respect to the exception in subsection (b), as detailed below, there do not appear to be any substantial differences in Ohio and New Jersey law on the enforceability of waiver-of-subrogation or limitation-of-liability contract clauses.

Specifically, "Ohio courts have repeatedly held that waiver-of-subrogation provisions are valid and enforceable." Westfield Ins. Grp. v. Affinia Dev., L.L.C., 982 N.E.2d 132, 139 (Ohio Ct. App. 2012). For example, in Westfield, the insurer of a property damaged by a fire filed a subrogation action against a contractor who was renovating the property, alleging that contractor negligently caused the fire. Id. at 133-35. The Fifth District Court of Appeals held that the insurer's claim was barred by a waiver-of-subrogation clause in the contract between the property owner and the contractor. Id. at 144-46. The court reasoned, "Waiver of subrogation is useful in construction contracts because it avoids disrupting the project and eliminates the need for lawsuits because it offers certainty as to the liability of the parties." Id. at 145.

Similarly, in Nationwide Mut. Fire Ins. Co. v. Sonitrol, Inc. of Cleveland, 672 N.E.2d 687, 692-93 (Ohio Ct. App. 1996), the Eight District Court of Appeals upheld a waiver-of-subrogation clause in a contract for the installation

A-1802-17T4

and monitoring of a security system for a school building. In so holding, the court noted, "Other jurisdictions construing similar contract provisions have upheld contract provisions where the parties agreed to waive claims of personal liability in the event of a loss or peril, with the understanding that the loss would be covered by insurance." Ibid. (quoting Len Immke Buick v. Architectural Alliance (1992), 611 N.E.2d 399, 402 (Ohio Ct. App. 1992)).

As have Ohio courts, New Jersey courts have upheld waiver-of-subrogation provisions. See, e.g., ACE Am. Ins. Co. v. Am. Med. Plumbing, Inc., ___ N.J. Super. ___, ___ (App. Div. 2019) (slip. op. at 10-12) (upholding waiver-of-subrogation clause in construction contract even as to "Non-work related" damages); Skulskie v. Ceponis, 404 N.J. Super. 510, 512-14 (App. Div. 2009) (upholding waiver-of-subrogation clause in a condominium unit owner's insurance policy); School Alliance Insurance Fund v. Fama Construction Co., 353 N.J. Super. 131, 140-41 (Law Div. 2001) (upholding mutual waiver of subrogation in contract between school district and construction firm), aff'd o.b., 353 N.J. Super. 1 (App. Div. 2002).

Most notably, in Synnex Corp. v. ADT Sec. Servs., Inc., 394 N.J. Super. 577, 580 (App. Div. 2007), we upheld "an exculpatory clause in a contract for the sale of a burglar alarm system, which require[d] the buyer to rely solely on

13

its own insurance for any loss from theft." In that case, the exculpatory clause provided that the customer agreed to look exclusively to the customer's insurer to recover for injuries and damages and waived all rights of recovery arising by way of subrogation. Id. at 582. We held that the insurer's subrogation action was barred by the exculpatory clause and the waiver of subrogation, finding that the clause was not contrary to public policy. See id. at 587-594. We noted, "Our courts have also recognized the appropriateness of exculpatory clauses designed to allocate responsibility for maintenance of insurance coverage and to avoid subrogation actions by insurance companies that attempt to shift responsibility for a covered loss to another party." Id. at 589.

Based on the lack of any significant divergence between the laws of Ohio and New Jersey with respect to waiver-of-subrogation clauses, National Fire has failed to show a fundamental policy in New Jersey that would suffice to override the parties' selection of Ohio law as governing the parties' rights under the contract. Accordingly, we affirm the trial court's application of Ohio law to this matter.

Unconscionability

National Fire next argues that the trial court erred in enforcing the waiver-of-subrogation clause because the contract was a contract of adhesion that was

both procedurally and substantively unconscionable. Although we conclude that the waiver-of-subrogation provision in the contract may have rendered it a contract of adhesion, we nonetheless affirm the trial court's ruling that the contract is not unconscionable under Ohio law.[3]

The Ohio Supreme Court has described a contract of adhesion as "a standardized form contract prepared by one party, and offered to the weaker party, usually a consumer, who has no realistic choice as to the contract terms." Taylor Bldg. Corp. of Am. v. Benfield, 884 N.E.2d 12, 24 (Ohio 2008) (citing Black's Law Dictionary 342 (8th ed. 2004)); see, e.g., DeVito v. Autos Direct Online, Inc., 37 N.E.3d 194, 203 (Ohio Ct. App. 2015) ("The loser-pays provision is tucked into a take-it-or-leave-it, preprinted, boilerplate arbitration agreement sent in an email to the vehicle purchaser among a stack of documents. As such, it is adhesive. There was little meaningful, face-to-face opportunity for understanding, negotiating, or altering the terms.").

---

[3] In its brief, Cintas notes that "National [Fire] appears to concede that the provisions are enforceable under Ohio law; it never argues that the Ohio [l]aw was incorrectly applied and instead, appears to premise all of its arguments on New Jersey [l]aw." Because National Fire did not brief the application of Ohio law, we deem National Fire to have waived the argument that the trial court incorrectly applied Ohio law. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

A-1802-17T4

Although there does not appear to be an appreciable difference in bargaining power between these two businesses, the additional terms and conditions were contained in small print on the back of a document which would commonly be characterized as a pre-printed, standard invoice. Even without specific evidence that RCMA unsuccessfully attempted to negotiate different terms, the fact that the additional terms were presented in such a manner allows for a reasonable inference that the terms were essentially on a "take-it-or-leave-it" basis.

"However, even a contract of adhesion is not in all instances unconscionable per se." Taylor, 884 N.E.2d at 24. "[I]t is incumbent upon the complaining party to put forth evidence demonstrating that the clause is adhesive and, moreover, that as a result of the adhesive nature, the clause is unconscionable." Schaefer v. Jim Brown, Inc., 33 N.E.3d 96, 100 (Ohio Ct. App. 2015) (quotation omitted). "A party challenging [a contract as unconscionable] must prove a quantum of both procedural and substantive unconscionability." Hayes v. Oakridge Home, 908 N.E.2d 408, 414 (Ohio 2009).

"Procedural unconscionability considers the circumstances surrounding the contracting parties' bargaining, such as the parties' age, education,

intelligence, business acumen and experience, . . . who drafted the contract, . . . whether alterations in the printed terms were possible, [and] whether there were alternative sources of supply for the goods in question." Taylor, 884 N.E.2d at 22 (alterations in original) (quotations and citations omitted). A party's "inability to understand the language of the agreement" may also support a finding of procedural unconscionability. Ibid. (quoting Restatement (Second) of Contracts, § 208, cmt. d (Am. Law Inst. 1981)).

In this regard, National Fire's strongest argument is that the additional terms were printed in small print on the back of the contract document. Although the copy of the contract in the appellate appendix is barely legible, it appears that the reproduction of it has contributed to the illegibility. That being said, National Fire does not submit a certification from Nagy that he was unable to read the terms due to the small size of the text, nor does National Fire contend in its brief that the terms were actually illegible, instead referring to them as "microscopic."

Ohio courts have found that small print does not render contracts unconscionable, as long as the print is actually legible and other factors do not render the contract unconscionable. See Brondes Ford, Inc. v. Habitec, 38 N.E.3d 1056, 1082 (Ohio Ct. App. 2015) (rejecting an argument that a

limitation-of-liability clause was unconscionable because it was contained in small print on the back of the contract document); Vincent v. Neyer, 745 N.E.2d 1127, 1132-33 (Ohio Ct. App. 2000) (rejecting an argument that an arbitration clause was unconscionable because it was printed on the back of the contract in small print, reasoning that consumers failed to read the entire contract and did not present evidence that the clause was non-negotiable); P & O Containers, Ltd. v. Jamelco, Inc., 641 N.E.2d 794, 799 (1994) ("While the print is small, it is not illegible and the language is understandable. A party's duty to read terms of a contract before entering into it depends on the facts of the specific case. Both parties are commercially sophisticated. This was not a consumer transaction.").

As in P & O Containers, there is insufficient procedural unconscionability to render the contract unenforceable. Although the contract was adhesive in nature, the agreement was between two business entities. There is no evidence in the record supporting that the parties had an appreciable difference in bargaining power, or that RCMA was unable to obtain services from another fire protection company. Even though the terms were in small print, it does not appear that the terms were actually illegible and would have prevented a meeting of the minds.

Likewise, as did the trial judge, we reject National Fire's contention that the contract was substantively unconscionable. "An assessment of whether a contract is substantively unconscionable involves consideration of the terms of the agreement and whether they are commercially reasonable." Hayes, 908 N.E.2d at 414. "Factors courts have considered in evaluating whether a contract is substantively unconscionable include the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability." Ibid. The inquiry is fact-specific and "var[ies] with the content of the agreement at issue." Ibid.

As discussed above, "Ohio courts have repeatedly held that waiver-of-subrogation provisions are valid and enforceable." Westfield, 982 N.E.2d at 139. Such waivers allow the parties to accurately predict that any losses will be covered exclusively by insurance. Ohio courts have not determined that such waivers are contrary to public policy or commercially unreasonable.

Contrary to National Fire's assertion, no different result would have adhered from the application of New Jersey law. Under New Jersey law, "the essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." Rudbart

v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353 (1992) (citation omitted).

Even assuming the contract was adhesive, however, as under Ohio law, "[t]he determination that a contract is one of adhesion, however, 'is the beginning, not the end, of the inquiry' into whether a contract, or any specific term therein, should be deemed unenforceable based on policy considerations." Muhammad v. Cty. Bank of Rehoboth Beach, Delaware, 189 N.J. 1, 15 (2006) (quoting Rudbart, 127 N.J. at 354). The New Jersey Supreme Court set forth the following factors to consider in determining whether a contract of adhesion in unconscionable:

> [I]n determining whether to enforce the terms of a contract of adhesion, courts have looked not only to the take-it-or-leave-it nature or the standardized form of the document but also to [(1)] the subject matter of the contract, [(2)] the parties' relative bargaining positions, [(3)] the degree of economic compulsion motivating the 'adhering' party, and [(4)] the public interests affected by the contract.
>
> [Id. at 15-16 (alterations in original) (quoting Rudbart, 127 N.J. at 356).]

We conclude that the contract was not unconscionable when considering these four factors. New Jersey courts have enforced waiver-of-subrogation clauses and have determined that they are not contrary to public policy. Again,

20

National Fire has not presented any specific evidence supporting a disparity in bargaining power or a degree of economic compulsion.

Additionally, the fact that the contested terms were in small print on the back of the contract is not an independent ground to render the terms unenforceable under New Jersey law. To be sure, in the context of evaluating whether arbitration clauses were "conspicuous," New Jersey courts have invalidated clauses based in part on the small size of the text. See Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 322-23 (2019) ("Even when located, the small size of the print makes the provision burdensome to read and appears to violate the font size requirements of the [Plain Language Act]."); Rockel v. Cherry Hill Dodge, 368 N.J. Super. 577, 586 (App. Div. 2004) (invalidating arbitration clause that was "onerous to read in light of the small size of the print" and was "difficult to locate" because there was no distinguishable reference to clause on the first page of the document.). But these cases dealt with consumer contracts and the specific requirement that an arbitration clause "must state its purpose clearly and unambiguously." Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 435 (2014). In this case, by contrast, the contract was between two business entities, and the front of the

contract document clearly indicated that acceptance was subject to the attached terms and conditions.

In sum, both Ohio and New Jersey law permit waiver-of-subrogation clauses, and there does not appear to be any substantial divergence between the jurisdictions on this issue. Indeed, National Fire has not identified a case from either jurisdiction in which a court invalidated a similar waiver-of-subrogation clause. Because National Fire has not presented a persuasive argument that the contract was unconscionable under either Ohio or New Jersey law, the trial court correctly granted summary judgment based on RCMA's waiver of subrogation.

Limitation-of-liability clause

Characterizing the limitation-of-liability clause as a liquidated damages clause,[4] National Fire argues that the clause is unreasonable and unenforceable under New Jersey law. National Fire maintains "the amount fixed in the subject

---

[4] The clause at issue here is best characterized as a limitation-of-liability clause. See Nahra v. Honeywell, Inc., 892 F. Supp. 962, 969 (N.D. Ohio 1995) ("Liquidated damages clauses, properly employed, attempt to fix in advance 'reasonable compensation for actual damages.' However, limitation of liability clauses by definition restrict the amount of compensation available, regardless of the actual damages ultimately suffered."). The limitation-of-liability clause in Cintas' contract does not attempt to fix reasonable compensation for actual damages, but rather restricts the amount of compensation available irrespective of actual damages. Accordingly, National Fire's reliance on Wasserman, Inc. v. Township of Middletown, 137 N.J. 238 (1994), for the standards to evaluate the enforceability of a liquidated damages provision, is misplaced.

A-1802-17T4

contract ($1,000.00) is not a reasonable forecast of just compensation for the harm caused by the breach of [Cintas]."  We disagree and conclude that the limitation-of-liability clause is not unconscionable under either Ohio or New Jersey law.

Under Ohio law, "[a] party seeking to avoid a limitations clause on grounds of unconscionability must show that the clause is commercially unreasonable and that he had no meaningful choice but to accept its inclusion in the contract."  Nahra v. Honeywell, Inc., 892 F. Supp. 962, 970 (N.D. Ohio 1995).  Similarly, under New Jersey law, a limitation-of-liability is unenforceable where it is unconscionable or violates public policy.  See Marcinczyk v. N.J. Police Training Comm'n., 203 N.J. 586, 593-94 (2010); Lucier v. Williams, 366 N.J. Super. 485, 491-92 (App. Div. 2004).

Similar limitation-of-liability clauses have been enforced by both Ohio and New Jersey courts.  See, e.g., Nahra, 892 F. Supp. at 970-72 (upholding limitation-on-liability clause in a contract for security alarm services to the lesser of $10,000 or the annual service fee and noting that "it was commercially reasonable for [the security company] to seek as a basis of the bargain a fixed limit on its potential liability.");  Brondes Ford, 38 N.E.3d at 1082 (upholding $250 limit of liability in a contract for fire alarm services);  Synnex, 394 N.J.

Super. at 591-94 (upholding limitation-of-liability clause in a business contract for a burglar alarm system that limited damages to the greater of 10% of annual service charge or $1,000); Tessler & Son, Inc. v. Sonitrol Sec. Sys. of N. New Jersey, Inc., 203 N.J. Super. 477, 481-86 (App. Div. 1985) (upholding a $250 limitation-of-liability provision in an alarm services contract).

Accordingly, we affirm the trial court's holding that the limitation-of-liability clause is not unconscionable, that it is commercially reasonable, and that it is therefore enforceable.

Discovery incomplete

Finally, we reject National Fire's argument that disputed issues of material fact precluded the entry of summary judgment. In that regard, a party opposing a motion for summary judgment on the grounds that discovery is incomplete, must "demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action." Badiali v. New Jersey Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015) (quoting Wellington v. Estate of Wellington, 359 N.J. Super. 484, 496 (App. Div. 2003)). The party must identify the specific discovery that is still needed. See Trinity Church v. Lawson-Bell, 394 N.J. Super. 159, 166 (App. Div. 2007) ("A party opposing summary judgment on the ground that more discovery is needed must specify

A-1802-17T4

what further discovery is required, rather than simply asserting a generic contention that discovery is incomplete."). "[D]iscovery need not be undertaken or completed if it will patently not change the outcome." <u>Minoia v. Kushner</u>, 365 N.J. Super. 304, 307 (App. Div. 2004).

National Fire notes that the trial court relied in part on the fact that there was no certification from a representative from RCMA supporting that RCMA did not understand the contractual terms. National Fire requests that "at a minimum, . . . this [c]ourt remand the matter for further discovery on the issue of the state of mind of the individuals preparing, drafting and executing the subject contract."

However, discovery would not be needed to obtain this evidence, as it would be within the control of National Fire's subrogor, RCMA. We also note that National Fire did not tender a certification from Nagy or another fact witness in opposition to the motion for summary judgment. Regardless, the state of mind of the individuals drafting and executing the contract is largely irrelevant to the issue of whether the challenged terms are unconscionable. In this case, involving two sophisticated business entities, we that any failure by Nagy to read the contract prior to signing it would be insufficient to overcome summary judgment.

25

To the extent we have not specifically addressed any arguments raised by the parties, we conclude they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1802-17T4